UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JERRILYNN R. RINGER, | ) | CASE NO. 5:16CV764 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF | ) | REPORT AND RECOMMENDATION |
| SOCIAL SECURITY, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Jerrilynn R. Ringer ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1. In her brief on the merits, filed on July 27, 2016, Plaintiff asserts that: (1) the administrative law judge ("ALJ") violated the treating physician rule; (2) the ALJ's residual functional capacity ("RFC") finding was not supported by substantial evidence; (3) the ALJ submitted an improper hypothetical question to the vocational expert ("VE"); and (4) this case should be remanded per sentence six of 42 U.S.C. § 405(g).  ECF Dkt. #13 at 16-23.  Defendant filed a reply brief on October 11, 2016.  ECF Dkt. #16.  On October 26, 2016, Plaintiff filed a reply brief.  ECF Dkt. #17.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

## I.    FACTUAL AND PROCEDURAL HISTORY

On November 1, 2012, Plaintiff filed applications for DIB and SSI.[2]  ECF Dkt. #11 ("Tr.") at 236, 242.[3]  Plaintiff's claim was denied initially and upon reconsideration.  *Id.*  Plaintiff then requested a hearing, which was held on November 5, 2014. *Id.* at 43.  On March 19, 2015, the ALJ issued a decision denying Plaintiff's claims.  *Id.* at 18.  Subsequently, the Appeals Council denied Plaintiff's request for review. *Id.* at 1.  Accordingly, the March 19, 2015, decision issued by the ALJ stands as the final decision.

Plaintiff filed the instant suit seeking review of the ALJ's March 19, 2015, decision on March 28, 2016.  ECF Dkt. #1.  On July 27, 2016, Plaintiff filed a brief on the merits.  ECF Dkt. #13.  Defendant filed a reply brief on October 11, 2016.  ECF Dkt. #16.  On October 26, 2016, Plaintiff filed a reply brief.  ECF Dkt. #17.

## II.    RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE

### A.    Medical Evidence

Plaintiff underwent surgery to remove a Morton's neuroma in her left foot in January 2009.[4] Tr. at 449.  Following her surgery, Plaintiff continued to report soreness or pain in her left foot.  *Id.* at 449, 452.  In September 2011, Plaintiff visited the Aultman Center for pain management requesting stronger medication, rating her pain as "10/10," and indicating that the pain radiated up her left side. *Id.* at 488.  Plaintiff also stated that she was waking up during the night due to the pain.

---

[2]The ALJ indicated that Plaintiff's applications for DIB and SSI were filed on October 25, 2012, however, the record shows that the applications were completed on November 1, 2012, the date cited by Plaintiff.  Tr. at 236, 242.

[3]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed as a .PDF, rather that the page numbers assigned by the CM/ECF system.  When the Transcript was filed the .PDF included an index, with the indexed pages differentiated from the numerical pages.  Accordingly, the page number assigned in the .PDF mirrors the page number printed on each page of the Transcript, rather than the page number assigned when the Transcript was filed in the CM/ECF system.

[4]Morton's neuroma involves a thickening of the tissue around one of the nerves leading to a toe.  The condition can cause a sharp, burning pain in the ball of the foot, and the toes may sting, burn, or feel numb. Morton's neuroma: Overview, Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/mortons-neuroma/home/ovc-20202652 (last visited March 14, 2017).

*Id.*  In response to Plaintiff's complaints, the attending physician continued her narcotic pain medication, told her to follow up with a visit in one month, and obtained a urine sample for medication monitoring.  *Id.*  Plaintiff's urine later tested positive for THC, and, accordingly, her narcotic prescriptions were discontinued.  *Id.* at 524.

On July 26, 2011, Plaintiff began treatment at Trillium Family Solutions.  Tr. at 616-27. Plaintiff reported having panic attacks and it was noted that Plaintiff had a history of "some nerve damage in her leg."  *Id.* at 625.  Otherwise, the appointment resulted in largely normal findings regarding Plaintiff's appearance, thought process, perception, mood, affect, behavior, cognition, and intelligence.  *Id.* at 625-26.  Plaintiff began treatment with Gamaliel Batalla, M.D., in October 2011. Tr. at 524.  Dr. Batalla indicated that Plaintiff was positive for joint pain, joint swelling, insomnia, fatigue, depression, anxiety, walking difficulty, and weakness.  *Id.* at 525.  On physical examination, Dr. Batalla noted swelling at the interdigital dorsal aspect of the left foot between the first and second toe, and sensory exam allodynia at the dorsal aspect of the left foot.  *Id.*  It was Dr. Batalla's impression that Plaintiff may experience complex regional pain syndrome ("CRPS") type two in the left lower extremity.  *Id.*  Dr. Batalla recommended a spinal cord stimulator, but Plaintiff did not have medical insurance and could not afford the device.  *Id.*  On November 16, 2011, Dr. Batalla indicated that Plaintiff had a "working diagnosis of [CRPS], type 1 of the lower left extremity," and told Plaintiff to continue with her present regimen of Topamax and Zanaflex, and to continue transcutaneous electrical nerve stimulation ("TENS") therapy.  *Id.* at 522.

On January 30, 2012, Plaintiff was examined by a consultative psychologist, Sylvester Huston, Ph.D., for a clinical interview relating to her claim for mental disability benefits.  Tr. at 740-47.  Plaintiff reported that she performed household chores "[a]s best as [she] could" and that her grandparents did most of the chores.  *Id.* at 742.  Continuing, Plaintiff indicated that she had the ability to drive, but "prefer[red] not to."  *Id.*  Dr. Huston described Plaintiff as "neat and fashionable in her appearance," and indicated that no abnormalities in speech or language were noted in terms of rate, volume, quantity, or articulation.  *Id.* at 742-43.  Plaintiff's speech was described as relevant and coherent, and her intelligibility was noted to be "100%."  *Id.* at 743.  Additionally, Plaintiff displayed appropriate affect, a cooperative mood, friendliness, and "a good deal of spontaneity."

-3-

*Id.* Plaintiff stated that she had difficulty sleeping due to her pain, and described herself as a "crier," and indicated that she "experienced difficulties" on the average of four out of seven days. *Id.* Continuing, Plaintiff reported experiencing difficulties with anxiety seven out of seven days, and that she often experienced multiple episodes of anxiety in a given day. *Id.* Dr. Huston noted that Plaintiff experienced difficulty in terms of her gait, and used a walker for assistance. *Id.*

Next, Dr. Huston indicated that Plaintiff reported that she began to experience anxiety following the onset of health-related difficulties. Tr. at 743. Dr. Huston noted that Plaintiff was not receiving mental health treatment at the time of the examination. *Id.* at 744. Plaintiff was diagnosed with adjustment disorder with mixed anxiety and depressed mood, and Dr. Huston assessed a symptom global assessment of functioning ("GAF") score of sixty, a functioning GAF score of sixty-five, and an overall GAF score of sixty. *Id.* Dr. Huston concluded that Plaintiff did not exhibit a pattern of an inability to adjust to work place demand and that there was no reported history of mental or emotional deterioration to work or work-related pressures, and stated that "[Plaintiff] is expected to respond appropriately to work and work[-]related pressures." *Id.* at 744-45.

On February 8, 2013, state-agency consulting physician Randy Plona, D.O., examined Plaintiff. Tr. at 749-55. Dr. Plona noted that Plaintiff used a walker and had great difficulty ambulating with the walker based on pain in her left lower extremity. *Id.* at 750. It was also noted that Plaintiff had difficulty maneuvering in the room, moving from a sitting to a standing position, and significant difficulty climbing on and off the examination table. *Id.* Dr. Plona indicated that Plaintiff displayed: no sensory deficits; no motor deficits except for the left lower extremity; symmetrical deep tendon reflexes in both the upper and lower extremities; an intolerance to perform straight leg raise testing; abnormal gait; ambulation with a walker; normal muscle testing of the upper extremities, right lower extremity, and hands; no muscle spasms or abnormal reflexes; no muscular atrophy; the ability to hold objects and dress and undress slowly; and a normal range of motion in all joints. *Id.* at 750-55. It was noted that it was unclear whether Plaintiff was incapable of performing the tasks she declined to attempt to perform, or if she was reluctant to perform these tasks secondary to pain. *Id.* at 750. Dr. Plona assessed that Plaintiff could perform work-related activities that involved seated work only with standing and walking with a four-pronged walker, and

-4-

that while in the sitting position Plaintiff could lift ten pounds frequently. *Id.* at 751. No limitations were assessed regarding Plaintiff's vision, hearing, speech, or the use of her hands. *Id.*

On February 11, 2013, state-agency reviewing physician Michael Delphia, M.D., reviewed Plaintiff's medical records and opined that Plaintiff's impairment met Listing § 1.02A. Tr. at 896. Later that month, on March 2013, state-agency consulting physician Tejaswini Shah, M.D., determined that, based upon the medical evidence, Plaintiff's impairments did not satisfy Listing 1.02A as there was "no established impairment of [the] peripheral joints." Tr. at 756. Dr. Shah opined that Plaintiff's RFC limited her to lifting twenty pounds occasionally, ten pounds frequently, standing/walking two to three hours in an eight-hour workday, and sitting for six hours in an eight-hour workday. *Id.* at 310.

On March 26, 2013, state-agency reviewing physician Esberdado Villanueva, M.D., reviewed Plaintiff's medical records and opined that Plaintiff could: occasionally lift twenty pounds; frequently lift ten pounds; stand or walk for three hours, and sit for six hours in an eight-hour workday; push or pull on a limited basis using her left leg; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, or crawl. *Id.* at 81-107. As part of this same determination, state-agency reviewing psychologist Robyn Hoffman, Ph.D., opined that Plaintiff experienced: mild difficulties in activities of daily living; mild difficulties in social functioning; no difficulties in concentration, persistence, or pace; and no episodes of decompensation. *Id.* It was Dr. Hoffman's conclusion that Plaintiff was not disabled. *Id.* at 105. In May 2013, state-agency reviewing physician Teresita Cruz, M.D., affirmed Dr. Villanueva's opinion. *Id.* at 109-38. Likewise, state-agency reviewing psychologist Karen Steiger, Ph.D., affirmed Dr. Hoffman's assessment and concluded that Plaintiff's anxiety and depression were not so severe as to be considered disabling. *Id.* at 138.

From October 2013 to October 2014, Plaintiff received treatment at Coleman Behavioral Health ("Coleman"), primarily with David Swope, M.D. Tr. at 759-889. Dr. Swope first treated Plaintiff in November 2013, and indicated that Plaintiff stated that she had been diagnosed with CRPS, was bed-bound for ninety-five percent of the day, had been depressed for many years, experienced anxiety attacks one to four times per day, had problems sleeping, and had cervical cell

dysplasia. *Id.* at 837. Treatment notes prepared by Dr. Swope consistently noted that Plaintiff presented: as well groomed; with average build, demeanor, eye contact, and activity; as cooperative; with full affect; without delusions, self-abuse, self-mutilation, hallucinations, or suicidal/homicidal ideation; with logical thought process; and with average intelligence. Tr. at 762-66, 773-77, 782-86, 793-97, 801-805, 807-11, 815-19, 823-27, 837-44. These findings remained largely consistent throughout the year Dr. Swope and other staff members at Coleman treated Plaintiff. *See id.* at 759-886.

On October 20, 2014, Dr. Swope issued an opinion regarding Plaintiff's mental abilities that were critical for performing unskilled work. *Id.* at 887-89. Dr. Swope opined that Plaintiff had a moderate loss in her ability to: remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple directions; ask simple questions or request assistance; and get along with co-workers or peers without unduly distracting the exhibiting behavioral extremes. *Id.* at 887-88. Continuing, Dr. Swope opined that Plaintiff experienced marked loss in her ability to: maintain concentration and attention for two-hour periods; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being unduly distracted by them; be aware of normal hazards and take appropriate precautions; and to accept instructions and respond appropriately to criticism from supervisors. *Id.* Dr. Swope also opined that Plaintiff had an extreme loss in her ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and work week without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number of rest periods; make simple work-related decisions; and respond appropriately to changes in a routine work setting. *Id.* Next, Dr. Swope indicated that Plaintiff had: a medically documented history of a mental disorder lasting at least two years that had caused more than minimal limitations on her ability to do any basic work activity; three or more episodes of decompensation within twelve months, each lasting at least two weeks; a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; and a history of at least one year of the inability to function outside a highly

supportive living arrangement with an indication of continued need for such an arrangement. *Id.* at 888.

In January 2015, the ALJ notified Plaintiff's counsel that he had received additional evidence from state-agency consulting physician Sushil Sethi, M.D., who examined Plaintiff after the hearing. Tr. at 362. Dr. Sethi reported that Plaintiff's lower extremities showed no edema or cyanosis in her legs, no clubbing of the toenails, no muscle atrophy, and no muscle spasm. *Id.* at 373, 376. Additionally, Dr. Sethi observed that Plaintiff had a normal range of motions in her arms, spine, wrists, fingers, shoulders, elbows, ankles, and hips, but a reduced range of motion in her knees. *Id.* at 373, 375-78. Dr. Sethi indicated that Plaintiff did not attempt to walk on her tiptoes or heels, did not use any ambulatory aid, presented with normal gait, and that a neurological exam showed normal results. *Id.* at 374. It was Dr. Sethi's opinion that Plaintiff could: sit for eight hours, stand for four hours, and walk for four hours in an eight-hour shift; and carry thirty to fifty pounds frequently and sixty to seventy pounds occasionally. *Id.* Dr. Sethi also indicated that Plaintiff's hearing, speaking, and "traveling" were normal. *Id.* Plaintiff filed a motion to strike the post-hearing consultative examination findings, claiming that Dr. Sethi's examination was deficient, and that Plaintiff presented to the appointment with a four-point walker and that the walker was taken from her before the examination and returned to her after the examination. *Id.* at 382-86. The ALJ overruled the motion to strike, stating that: no weight was attached to the absence of the four-point walker in light of multiple references to the use of such a device found elsewhere in the record; and that Dr. Sethi's report was compliant with the requirements of the Programs Operation Manual on its face and that he would not substitute his judgment, or the judgment of Plaintiff or her counsel, for that of Dr. Sethi. *Id.* at 21.

After obtaining Medicaid coverage and the required referral from a primary care physician, Plaintiff visited Paul T. Scheatzle, D.O. on August 19, 2015 for a Functional Capacity Evaluation ("FCE"). ECF Dkt. #13 at 13; ECF Dkt. #13-1. This FCE was issued five months after the ALJ issued his decision finding that Plaintiff was not disabled. Tr. at 18; ECF Dkt. #13-1. Dr. Scheatzle made the following assessments: [reflex sympathetic dystrophy] in the left leg; depression; anxiety; and abnormality of gait. ECF Dkt. #13-1 at 1. Continuing, Dr. Scheatzle indicated that Plaintiff had

the ability to: lift up to ten pounds occasionally and zero pounds frequently; walk occasionally up to 150 feet with rollator walker, no weight bearing on the left forefoot; and stand occasionally and sit frequently with the changing of positions every thirty minutes. *Id.* Dr. Scheatzle further opined that Plaintiff could not climb or crawl, perform combined bending and twisting, or use her left leg or left foot. *Id.*

### B.   Testimonial Evidence

The ALJ held a hearing on November 5, 2014. Tr. at 37-80. Plaintiff, her counsel, and a VE appeared for the hearing. *Id.* On questioning by the ALJ, Plaintiff testified that she lived with her grandparents in a home with a single story and a basement, and that she did not go in the basement. *Id.* at 45. Plaintiff acknowledge that she had a walker at the hearing, and stated that she used the walker whenever she was walking, even around the house. *Id.* at 46. Continuing, Plaintiff testified that she had been using the walker for at least three years, and had been using a cane but stopped because the cane was causing pain in her right leg and back. *Id.* Plaintiff indicated that she used the walker on a daily basis and also had a transcutaneous electrical nerve stimulation ("TENS") unit. *Id.* at 46-47. When asked whether she was working, Plaintiff testified that she had not worked anywhere in 2014 and that her last job was a hostess position at a chain restaurant. Tr. at 48. Plaintiff indicated that she had previously worked as a "bakery girl" for a year before she took the hostess position. *Id.*

Next, Plaintiff testified that after her foot pain began an MRI revealed a Morton's neuroma in her left foot. Tr. at 51. Plaintiff stated that she chose to have surgery on the neuroma rather than pursue cortisone shot treatment. *Id.* Continuing, Plaintiff indicated that the pain in her left foot became worse after the surgery, and that following the surgery the pain went up her left leg and into her back, and that she even experienced numbness in her arms and hands. *Id.* Plaintiff testified that she experienced constant pain and swelling in her left foot, that the left foot was always colder than the right foot, and that the left foot was discolored eighty percent of the time. *Id.* at 51-52. Regarding sensitivity to touch in the left leg, Plaintiff testified that sometimes even a gust of wind causes a high level of pain, and that this level of sensitivity is present about half of the time. *Id.* at 52. Plaintiff testified that she had an "electrical feeling" the half of the time that she was not

experiencing this extreme level of sensitivity.  *Id.*  According to Plaintiff's testimony, she had previously received injections in her back in an effort to "help calm the nerve [that was] causing [Plaintiff's] pain."  Tr. at 53.  Plaintiff stated that after the shots the pain would be worse for a while and would then return to normal.  *Id.*

Plaintiff testified that she could not dress herself from the bottom down and required assistance, and that she wore slippers because any pressure on her left foot caused a great deal of pain.  Tr. at 53-54.  Continuing, Plaintiff claimed that she had not taken a bath in a long time, and that she required help when showering.  *Id.* at 54.  Plaintiff also testified that she could not handle more than two stairs.  *Id.*  When asked by the ALJ about her driving habits, Plaintiff indicated that she could drive to her therapy and psychiatric appointments, but had to cancel some appointments due to pain that restricted her ability to drive.  *Id.*  Plaintiff testified that she had not taken any trips that involved flying or spending more than two hours in the car since 2011.  *Id.* at 55.  Next, Plaintiff testified that she did not help with the cooking, chores, or laundry, and that her grandmother performed these activities.  Tr. at 61.  The ALJ then asked Plaintiff if she had any hobbies and what she did to pass the time.  *Id.*  Plaintiff indicated that she "used to be a reader," but due to concentration problems stemming from her anxiety she can only read at a quarter of the speed that she could in the past.  *Id.*  Continuing, Plaintiff indicated that she could watch thirty minutes to an hour of television before she began to stare off into space, and that she wrote in a journal to try and control her emotions.  *Id.* at 55-56.

Plaintiff testified that she continued to experience forty-five minute panic attacks, and that the last panic attack had occurred three days prior to the hearing.  Tr. at 56.  The ALJ then asked Plaintiff about her panic attacks, and she testified that the attacks started with a feeling of sickness and an inability to breathe, at which point she had to call her grandmother to calm her down and put Plaintiff's head in between her legs.  *Id.*  Plaintiff stated that once the panic attack stopped, she would usually cry for twenty minutes, and would then be so exhausted that she would need to go to sleep.  *Id.*  Continuing, Plaintiff testified that she had a low level of energy, and sometimes had to force herself to eat due to a lowered appetite.  *Id.* at 57.  Plaintiff indicated that she had difficulty sleeping at night, and would sometimes wake in the middle of the night in a cold sweat.  *Id.*

According to Plaintiff, she was able to sleep six hours per night when on medications, and only four hours without medications.  *Id.*  When asked by the ALJ how many panic attacks she had per week or per month, Plaintiff testified that she experienced one to two panic attacks a week and four to five panic attacks in a month on her current medication regimen, but that she had been experiencing panic attacks every other day prior to being given the medications.  *Id.*  According to Plaintiff, she had also quit smoking and had not had a cigarette in over a year.  *Id.*

When asked about her relationship with her family by the ALJ, Plaintiff indicated that she was close to her grandparents, since they had raised her, and that she did not see her sisters, but still talked with them.  Tr. at 59.  Plaintiff also stated that she was "pretty close" with an aunt who lived about ninety minutes away, and that they talked on the phone.  *Id.*  Further, Plaintiff stated that her aunt would use Facetime to call Plaintiff from concerts so that Plaintiff could watch the performance.  *Id.*  Plaintiff indicated that the last time she was able to attend a concert was before she was diagnosed with the Morton's neuroma.  *Id.* at 59-60.  Additionally, Plaintiff testified that she had not seen a film in theaters in many years, and that the last time she went to a restaurant she fell after tripping on an uneven sidewalk.  *Id.* at 60. Plaintiff stated that she also fell once while walking in her house without the walker.  *Id.* at 61.  Continuing, Plaintiff testified that she used a bedpan at least once a week when she was unable to rise from bed to go to the bathroom.  *Id.* Plaintiff testified that she did not have a boyfriend, and that she had friends that called her, but there was no way to spend time with them.  *Id.*  The ALJ then concluded his questioning of Plaintiff.  *Id.*

Plaintiff was next questioned by her counsel.  Tr. at 61.  On questioning by her counsel, Plaintiff testified that she had not fallen in approximately two years because of the walker.  *Id.* Plaintiff stated that her pain was never below a six on a scale of one to ten, and that the pain could be aggravated by movement or worsen when she was doing "absolutely nothing."  *Id.* at 64. Continuing, Plaintiff testified that her foot was always swollen, and that the swelling was aggravated by movement.  *Id.*  Plaintiff testified that she normally did not wake before 1:00 P.M., except to go to the bathroom, if it was possible for her to leave the bed, due to low levels of energy, and that she spends ninety-five percent of her time in bed.  *Id.* at 65.  When asked about her daily activities, Plaintiff stated that her grandfather had to explain her doctor's bills to her, which was not

-10-

the case in the past, and that she found it hard to concentrate because of the pain, anxiety, and/or depression.  *Id.* at 66.

When asked whether her anxiety had improved with the medication, Plaintiff testified that she would take the medication if she felt the panic attack coming, and that the duration of the panic attack would be reduced from forty-five minutes to twenty minutes.  Tr. at 66.  Plaintiff stated that she always felt anxious, even with the medications.  *Id.*  Continuing, Plaintiff testified that she did not feel anxious before she had the Morton's neuroma, and that she had been very active and social, and had played sports.  *Id.*  Plaintiff stated that she experienced "a little bit of depression" when her parents divorced, but that had been when she was thirteen or fourteen.  *Id.* at 66-67.  Plaintiff testified that one of the thoughts that contributed to her depression was the fact that she was twenty-nine years old, living with her grandparents, and required them to take care of her physically and financially.  *Id.* at 67.  Additionally, Plaintiff indicated that it was very frustrating that people told her that she had a "made-up disease."  *Id.*  Next, Plaintiff's counsel asked her how she dealt with stress.  *Id*.  Plaintiff stated that she spent time alone in her bedroom because when stressed she became "snappy" with her grandparents, which only worsened her sadness, depression, and anxiety. *Id.*  Continuing, Plaintiff was asked whether there were occasions on which she had to deal with angry customers during her time as a hostess and in her other retail positions.  Tr. at 68.  Plaintiff testified that she had to deal with angry customers "a lot," and that she would not be able to deal with such customers at the time of the hearing because, based on her best assumption, she would react angrily.  *Id.*

When asked whether pain relief programs provided any real significant and lasting relief, Plaintiff replied that the pain programs had not been successful.  Tr. at 69.  Plaintiff testified that the strongest pain medication she was prescribed was a twelve-hour time-release morphine, but the morphine never really helped relieve her pain.  *Id.* at 70.  Continuing, Plaintiff testified that the only medicine that helped was Nucynta, but that she did not have medical insurance and her grandparents

-11-

could not afford to pay $400.00 per month for this medication.[5] *Id.* Plaintiff stated that the Nucynta did not take all of the pain away, and reiterated that her pain was never below a six out of ten. *Id.* Plaintiff's counsel then asked whether Plaintiff had a pending application for Medicaid, to which she answered in the affirmative. *Id.*

The ALJ then questioned Plaintiff about some discussion of a wheelchair in the record. Tr. at 71. Plaintiff testified that her great-grandmother, who had a number of health problems, passed away and Plaintiff was able to obtain her cane, walker, and wheelchair. *Id.* at 72. Continuing, Plaintiff testified that she was able to use the wheelchair to have a friend take her to watch her other friends "play" (based on Plaintiff's prior testimony, it appears that she is referring to playing small concerts at local venues), but she would have to be taken home after twenty to twenty-five minutes, or call her grandparents to come pick her up after that same amount of time. *Id.* The ALJ then asked Plaintiff about a treatment note from 2014 referring to attending a concert with her aunt, and asked Plaintiff whether she attended a concert with her aunt. *Id.* Plaintiff testified that her aunt wanted her to come to a concert, and that she discussed attending the concert with Dr. Swope, but ultimately decided not to attend the concert because her aunt typically sat in the front and Plaintiff thought she would be in too much pain sitting, rather than lying down, and that her leg might be "pushed" in the busy front area of the venue. *Id.* at 72-73. It was stated by Plaintiff that she watched concerts remotely via Facetime messaging with her aunt. *Id.* at 72.

The VE was then examined by the ALJ. Tr. at 73. The VE testified that Plaintiff had performed work as a hostess and bakery clerk, and that there would be no transferable skills from either job. *Id.* at 73-74. The ALJ then posed a hypothetical individual of the same age, education, and work experience as Plaintiff, with the following limitations: sedentary work as typically defined; no foot controls with the lower left extremity; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl; and avoid all exposure to hazards such as unprotected heights and concentrated exposure to extreme temperatures. *Id.* at 74. The VE testified that a hypothetical individual would be unable to perform any of Plaintiff's

---

[5]Nucynta is an opioid pain medication used to treat moderate to severe pain. Nucynta, https://www.drugs.com/nucynta.html (last visited March 14, 2017).

past work, but could perform the jobs of touch-up screener, bonder, and document preparer. *Id.* at 74-75.

The ALJ then added the additional limitation of unskilled and semi-skilled work in an environment free of any strict time or strict high production quotas, and only frequent interaction with others. *Id.* at 75. The VE testified that these additional limitations would not impact the jobs the hypothetical individual could perform. *Id.* Next, the ALJ added the limitation that this hypothetical individual could only stand and/or walk, in combination, for less than one hour per day. *Id.* The VE indicated that the document preparer job could no longer be performed by this hypothetical individual, and substituted the job of patcher. *Id.* Continuing, the ALJ asked if the addition of an assistive device for standing and walking would impact the hypothetical individual's ability to perform these three jobs. *Id.* at 76. The VE testified that these three positions, touch-up screener, bonder, and patcher, were sedentary and thus an assistive device would not interfere. *Id.* When asked about time off-task and absences by the ALJ, the VE testified that the threshold for off-task behavior was typically nine minutes or fifteen percent, and that for unskilled work, an employer will typically tolerate two absences, tardies, or instances of leaving early (the VE did not specify a time period). *Id.*

The VE was then questioned by Plaintiff's counsel. Tr. at 77. Plaintiff's counsel asked the VE to consider the ALJ's first hypothetical individual, with the following additional limitations: requires a four-pronged assistive device for all walking and standing on or around the job site; and is able to sit for six hours in an eight hour workday, but must elevate both legs the entire time while sitting. *Id.* The VE testified that if the hypothetical individual's limitation required that the legs be elevated over eighteen inches, the height of a foot stool, there would by no competitive work available. *Id.* at 78. Plaintiff's counsel then added the limitation that the hypothetical individual must elevate the left leg to heart level the entire workday. *Id.* The VE testified that no competitive work would be available without the modification of a workstation. *Id.* Plaintiff's counsel then asked the VE to once again consider the first hypothetical individual, as described by the ALJ, with the added limitation that the individual must take two additional breaks, each of a twenty minute duration, one in the morning and one in the afternoon, beyond the breaks that are typically offered

in competitive work.  *Id.* at 79.  The VE testified that this hypothetical individual would be unable to perform Plaintiff's past work or other work.  *Id.*  Plaintiff's counsel indicated that he had no additional questions for the VE, and the ALJ concluded the hearing.  *Id.* at 79-80.

### III.     RELEVANT PORTIONS OF THE ALJ'S DECISION

After holding the hearing on November 5, 2014, the ALJ issued a decision on March 19, 2015.  Tr. at 15, 37.  The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2016, and that Plaintiff had not engaged in substantial gainful activity since July 3, 2011, the alleged onset date.  *Id.* at 18.  Continuing, the ALJ determined that Plaintiff had the following severe impairments: lumbago; neuritis or radiculitis of the thoracic and lumbar spine (referred to collectively by the ALJ as the "lumbar impairment"); complex regional pain syndrome/reflex sympathetic dystrophy of the left foot (referred to collectively as the "left foot impairment"); major depressive disorder; panic disorder with agoraphobia; and chronic pain syndrome.  *Id.*  The ALJ then determined that through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*

After consideration of the record, the ALJ found that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that Plaintiff: would frequently require an assistive device for periods of standing and/or walking; may never operate foot controls with the lower left extremity; may occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; may never climb ladders, ropes, or scaffolds; must avoid all concentrated exposure to extremes of temperature and all exposure to workplace hazards, including unprotected heights and dangerous moving machinery; and would be limited to the performance of unskilled to semi-skilled work tasks, undertaken in a work setting free of strict time demands or high production quotas, with no more than frequent interaction with others.  Tr. at 20.

Following the RFC finding, the ALJ determined that Plaintiff was unable to perform past relevant work.  Tr. at 26.  The ALJ then indicated that Plaintiff was a younger individual on the alleged disability onset date, had at least a high school education and was able to communicate in English, and that the transferability of job skills was not material to the determination of disability

because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled. *Id.* at 27. Considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy that Plaintiff could perform. *Id.* In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 3, 2011, through the date of the decision. *Id.* at 28.

## IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this

Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937(citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal citation omitted)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI.     LAW AND ANALYSIS

### A.     Treating Physician Rule

Plaintiff first asserts that the ALJ violated the treating physician rule because controlling weight should have been afforded to the opinion of Dr. Swope. ECF Dkt. #13 at 17. An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how her case is determined, especially when she knows that her treating physician has

-16-

deemed her disabled and she may therefore "be bewildered when told by an administrative bureaucracy that [s]he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir. 1999)).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Id.*  If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 551 (6th Cir. 2010).  The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, 413 Fed.Appx. 856, 864 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ).  However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence.  *See* 20 C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir. 2004).  Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

Plaintiff asserts that the ALJ's decision should be vacated as he failed to analyze Dr. Swope's opinion to determine if the opinion was well supported by medically acceptable clinical and laboratory techniques, and the ALJ's failure to analyze and determine if Dr. Swope's opinion is inconsistent with other substantial evidence in the record.  ECF Dkt. #13 at 18 (citing 20 C.F.R. § 1527(d)(2); Social Security Rule ("SSR") 96-2p; and *Wilson*, 378 F.3d at 544).  Continuing, Plaintiff contends that, along with the Medical Source Statement, the record contains 154 pages of

medical evaluations and treatment records from Dr. Swope and Erica Spencer, Plaintiff's counselor at Coleman. ECF Dkt. #13 at 18 (citing Tr. at 759-886, 942-58, 959-67). Plaintiff contends that Dr. Swope's opinion is well supported by medically acceptable clinical techniques, and that there are no laboratory tests or techniques that can evaluate mental disorders such as Plaintiff's major depressive disorder (recurrent, severe, without psychotic features), and panic disorder with agoraphobia. *Id.* at 18-19. According to Plaintiff, she and Dr. Swope held numerous treatment sessions, and Dr. Swope had the benefit of reviewing Ms. Spencer's counseling session records. *Id.* at 19. Continuing, Plaintiff asserts that Dr. Swope's opinion is supported by the clinical interviews and MSEs contained in the treatment notes. ECF Dkt. #13 at 19. To support this position, Plaintiff cites to a treatment session on January 26, 2015, during which Dr. Swope noted that Plaintiff was "still depressed and having issues with sleep" and "she has depression and panic associated with chronic illness," and then assigned a GAF score of forty-five. *Id.* at 19-20 (citing Tr. at 942, 945 946).

Next, Plaintiff asserts that the ALJ did not provide good reasons explaining why Dr. Swope's opinion "is not well-supported by medically acceptable clinical techniques." ECF Dkt. #13 at 20. Plaintiff claims that the ALJ "failed to address the first step of the required assessment of the treating physician's opinion and instead the ALJ jumped ahead into step two and claimed Dr. Swope's opinion "is not somehow inconsistent with his treatment records." *Id.* According to Plaintiff, this is a mischaracterization of Dr. Swope's treatment records, and the issue of consistency was "not to be considered until the ALJ first resolves the issue of whether the treating physician's opinion gets controlling weight." *Id.* Plaintiff cites the following passage from *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013), in support of this position:

> To be sure, the ALJ discusses the frequency and nature of Dr. Onady's treatment relationship with Gayheart, as well as internal inconsistencies between the doctor's opinion and portions of her reports. But these factors are properly applied only after the ALJ had determined that a treating source opinion will not be given controlling weight.

710 F.3d at 376. Continuing, Plaintiff avers that her activities of daily living do not establish that she can sustain full-time competitive employment. ECF Dkt. #13 at 20-21.

-18-

Defendant first contends that the ALJ did not completely discount Dr. Swope's opinion. ECF Dkt. #16 at 13-14.  Next, Defendant asserts that the Sixth Circuit has rejected the narrow, formalistic two-step approach suggested by Plaintiff when reviewing the ALJ's reasons for discounting a treating source's opinion.  *Id.* at 14.  Defendant asserts that the ALJ may meet the goal of the "good reasons" requirement if he indirectly attacks both the supportability of the treating physician's opinion and the consistency of that opinion with the rest of the record evidence.  *Id.* (internal citations omitted).  Specifically, Defendant avers that nothing in the *Gayheart* decision prohibits the Court from reviewing the ALJ's decision, as a whole, to determine whether the ALJ implicitly provides reasons for declining to give controlling weight the a treating source's opinion. *Id.* at 15.

Continuing, Defendant asserts that the ALJ provided several valid reasons as to why Dr. Swope's opinion was entitled to little weight, specifically: the opinion suggested limitations far beyond those justified in Dr. Swope's treatment notes; and Dr. Swope's treatment notes consistently reported that Plaintiff presented as cooperative, with an average demeanor and as fully oriented with no impairment of concentration, memory, or attention, and with average intellectual functioning. ECF Dkt. #16 at 15 (citing Tr. at 759, 760, 762, 773-74, 802, 831-32, 848-49).  Defendant contends that Plaintiff has failed to explain how this analysis is either inaccurate or unreasonable.  *Id.*  Next, Defendant cites to portions of Dr. Swope's treatment notes from November 2013 and September 2014 where it was indicated that Plaintiff presented as well-groomed with an average demeanor, cooperative behavior, average eye contact, logical thought process, average intellectual function, thought content free of suicidal or homicidal ideation, and no impairment of attention, concentration, or memory.  *Id.* (citing Tr. at 759-60, 845-55, 949).  Additionally, Defendant indicates that in his decision, the ALJ properly stated that Plaintiff's mental status examinations have consistently, albeit not universally reported minimal or normal findings.  *Id.* at 16.  Defendant also asserts that Plaintiff's claim that the ALJ presented a mischaracterization of Dr. Swope's treatment records does not specify what was inaccurate in the ALJ's recitation of the treatment records.  *Id.* at 17.

Next, Defendant notes that the ALJ agreed with Dr. Swope that Plaintiff had depression and panic disorder, and asserts that Plaintiff ignored the portions of Dr. Swope's treatment notes

-19-

indicating that: Restoril helped with Plaintiff's symptoms; Plaintiff had no prior mental health hospitalizations; Plaintiff presented with good grooming, a cooperative demeanor, good eye contact, clear speech, full affect, logical thought process, no suicidal or homicidal ideation, no impairments related to attention, concentration, or memory, and good insight and judgment; and the GAF scores of fifty-one (assigned in October 2013) and fifty-five (assigned in February, July, and September 2014) showed only moderate difficulty in functioning.  ECF Dkt. #16 at 17.  In sum, Defendant contends that the ALJ provided "good reasons" for assigning little weight to Dr. Swope's opinion, and those reasons implicitly established that the ALJ afforded little weight to the opinion because it was inconsistent with the record and since it was not supported by objective findings.  *Id.* at 18.

Plaintiff's arguments are without merit.  After establishing that Dr. Swope was Plaintiff's treating physician and discussing the treatment notes provided by Dr. Swope, Plaintiff presents her first legal argument.  Specifically, Plaintiff argues that the ALJ violated the treating physician rule because he did not apply the rule in the manner dictated in *Gayheart.*  ECF Dkt. #13 at 20.  *Gayheart* states that treating source opinions must be given controlling weight if two conditions are met: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the record.  710 F.3d at 376.  "If the [Defendant] does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and supported by relevant evidence."  *Id.*

Plaintiff asserts that "[t]he ALJ failed to address the first step of the required assessment of the treating physician's opinion, and instead the ALJ jumped ahead into step two and claimed Dr. Swope's opinion is not somehow inconsistent with his treatment records."  ECF Dkt. #13 at 20.  The first step in the test presented in *Gayheart* required that the ALJ assess whether the opinion was well-supported by medically acceptable clinical and laboratory diagnostic techniques, and whether the opinion was inconsistent with the other substantial evidence in the record.  Here, the ALJ explicitly stated, "[Dr. Swope's] opinion is not entitled to controlling weight.  The opinion suggests

-20-

limitations far beyond those justified in his own treatment records." Tr. at 26.  The ALJ goes on to state:

> For example, [Dr. Swope's] treatment records consistently report that [Plaintiff] presents as cooperative, with an average demeanor, and as fully oriented with no impairment of concentration, memory, or attention, and with average intellectual function.  Considering these inconsistencies, I afford his opinion little weight.

*Id.*

As an initial manner, and as the ALJ stated, Dr. Swope's treatment notes, specifically the MSE portions of those treatment notes, do indicate that Plaintiff consistently presented with normal appearance, behavior, eye contact, affect, thought process, thought content, insight, and judgment at every appointment over the course of the year she was treated by Dr. Swope, with only minor deviations.  *See* Tr. at 762-66, 773-77, 782-86, 793-97, 801-805, 807-11, 815-19, 823-27, 942-58. In contrast, Dr. Swope's opinion assessed moderate to extreme loss in every mental ability critical for performing unskilled work.  *See id.* at 887-88.  For example, Dr. Swope opined that Plaintiff had extreme loss in her ability to make "simple work-related decisions," despite consistently reporting in his treatment notes that Plaintiff presented with logical thought process, unremarkable thought content, unremarkable cognitive impairment, and good insight and judgment.  *See id.* at 762-66, 773-77, 782-86, 793-97, 801-805, 807-11, 815-19, 823-27, 942-58.  Accordingly, the ALJ determined that Dr. Swope's opinion was inconsistent with the other substantial evidence in the record, and therefore did not afford the opinion controlling weight.  This determination did not violate the first step of the test established in *Gayheart*.[6]  For these reasons, Plaintiff's claim that the ALJ failed to address the first step of the test established in *Gayheart* is without merit.

To the extent Plaintiff contends that the ALJ improperly merged the first and second steps of the test established in *Gayheart,* this argument is also without merit.[7]  *See* ECF Dkt. #13 at 20.

---

[6]The first step in the test established in *Gayheart* requires the ALJ to give the treating-source's opinion controlling weight if two conditions are met: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and (2) the opinion is not inconsistent with the other substantial evidence in the record.  710 F.3d at 736.

[7]It is unclear from Plaintiff's brief whether this argument is raised, however, she does state the argument in her reply.  *See* ECF Dkt. #13 at 20; ECF Dkt. #17 at 5.  Giving Plaintiff the benefit of the doubt as to whether this argument was raised in the initial brief, the undersigned will address the argument.

The ALJ found that Dr. Swope's opinion was inconsistent with the other substantial evidence in the record, thus allowing him to afford less than controlling weight to the opinion.  Since the ALJ properly afforded less than controlling weight to Dr. Swope's opinion, the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and supported by relevant evidence.  *Gayheart,* 710 F.3d at 736.  The ALJ considered length, frequency, nature, and extent of the treatment, as demonstrated by the numerous citations to Dr. Swope's treatment notes in the body of the decision, and the indication that Plaintiff had been treating with Dr. Swope for approximately one year.  *See* Tr. at 29-32.  Likewise, the ALJ specifically mentions that he considered Dr. Swope's professional certifications and specialty.  *Id.* at 32.  As described above, the ALJ also considered the consistency of Dr. Swope's opinion with the record as a whole, and found the opinion to be inconsistent.  Accordingly, the ALJ properly satisfied both steps of the test established in *Gayheart*.

In *Gayheart*, the Sixth Circuit found the ALJ's conclusion that the treating-source's opinions were "not well supported by any objective findings" was too ambiguous, and that the ALJ did not identify the substantial evidence that was purportedly inconsistent with the treating-source's opinions.  710 F.3d at 377.  In the instant case, the ALJ found that Dr. Swope's opinion was not supported by his own treatment notes and explained the reasons behind this determination.  *See* Tr. at 32.  The ALJ was not ambiguous about the objective findings that did not support Dr. Swope's opinion and identified the treatment notes as the substantial evidence that was inconsistent with Dr. Swope's opinion.  Plaintiff does not cite any source indicating that the test established in *Gayheart* requires a rigid application moving from step one to step two in a formulaic manner with no overlap in the analysis by the ALJ.  Additionally, such a reading overlooks the fact that the ALJ was instructed by the Sixth Circuit, per *Gayheart*, to consider whether the ALJ's opinion was inconsistent with the record as a whole at both steps of the test.  For these reasons, the ALJ provided good reasons for assigning little weight to Dr. Swope's opinion and thus did not violate the treating physician rule.  **B.** **Substantial Evidence**

-22-

Plaintiff briefly argues that the ALJ's RFC finding was not supported by substantial evidence.  ECF Dkt. #13 at 21-22.  Specifically, Plaintiff asserts that the ALJ applied an improper standard of law to this claim because there is no requirement that an individual must use a walker to prove that she is unable to ambulate effectively.  Defendant contends that Plaintiff misreads both the ALJ's decision and the Listings, indicating that the ALJ concluded that "[c]onsidered as a whole, the record does not support that [Plaintiff] is unable to ambulate effectively, as that term is defined within the listings."  ECF Dkt. #16 at 7-8 (citing Tr. at 18).

Listing 1.02A requires the "[i]nvolvement of one major peripheral weight-bearing joint (*i.e.*, hip knee or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b."  Listing 1.00B2b(1) defines inability to ambulate effectively" as:

> Inability to ambulate effectively means... having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device that limits the functioning of *both* upper extremities.

(emphasis added).  The ALJ indicated that Plaintiff presented with a walker for ambulation at the examinations sponsored by the Social Security Agency, but also noted that in sessions with her primary care physician and psychologist, Plaintiff was able to "ambulate well enough with the use of a cane involving only a *single* upper extremity."  Tr. at 18, 748-55, 762, 773, 782, 793, 801, 815, 823, 841, 902, 928-41 (emphasis added).  The ALJ also discussed the opinion of Dr. Delphia, which found that Plaintiff met Listing 1.02A, and concluded that this opinion was an "outlier" as it was against the manifest weight of all other opinions of record.  *Id.* at 18.

Additionally, Listing 1.02A requires the involvement of one major peripheral weight-bearing joint.  Plaintiff makes no attempt to satisfy this requirement of Listing 1.02A, instead focusing the entirety of her argument on the issue of the definition of effective ambulation.  Accordingly, even if Plaintiff could demonstrate that she was unable to ambulate effectively, she would still be unable to satisfy all criteria of Listing 1.02A.  In fact, during examinations in February 2013 and January 2015, the range of motion in Plaintiff's joints was largely normal, with the exception being a slight reduction in the range of motion in her knees during the January 2015 examination.  Tr. at 750, 367, 370-72, 753-55.  For these reasons, Plaintiff's argument that the ALJ's RFC finding was not supported by substantial evidence is without merit.

-23-

### C.      Sentence Six Remand

Plaintiff asserts that the FCE performed by Dr. Scheatzle is new and material evidence, and that good cause as to why it could not be submitted before the ALJ's decision was issued.[8]  ECF Dkt. #13 at 23.  Plaintiff claims that she did not have medical insurance, income, or resources to pay for the FCE, and that her Medicaid application was delayed, further prohibiting her from obtaining the FCE.  *Id.*  It is also noted by Plaintiff that once she was approved for Medicaid, she had to wait an additional period of time for the FCE as she needed a referral from a primary care physician to see Dr. Scheatzle, a specialist.  *Id.*

Defendant contends that Dr. Scheatzle's FCE does not qualify as new evidence because it was not unavailable to Plaintiff prior to the ALJ's decision.  ECF Dkt. #16 at 19.  Specifically, Defendant argues that Plaintiff's claim that she was unable to afford the FCE is undermined by the fact that Dr. Batalla, a physician board-certified in pain medication, saw Plaintiff in November 2011, and Plaintiff receiving treatment from Dr. Swisher from June 2011 through at least November 2014. *Id.*  Defendant contends that Plaintiff has failed to explain why she could not obtain an opinion from either Dr. Batalla or Dr. Swisher regarding her functional limitations stemming from her CRPS.  *Id.* Additionally, Defendant asserts that Plaintiff was represented by counsel during the administrative proceedings and was aware of her burden to produce medical evidence supporting her disability application.  *Id.* at 19-20.

Continuing, Defendant avers that Dr. Scheatzle's FCE is not material evidence because there is no reasonable probability that it would have changed the ALJ's decision.  Defendant asserts that Dr. Scheatzle's FCE is cumulative of Plaintiff's prior medical evidence, and thus would not have

---

[8]In her brief, Plaintiff argues that the hypothetical question posed by the ALJ to the VE was improper prior to asserting that this case should be remanded under 42 U.S.C. § 405(g).  ECF Dkt. #13 at 22-23. However, given that Plaintiff's argument regarding the hypothetical question is largely based on Dr. Scheatzle's FCE, these two issues are more adequately addressed in this order.

altered the ALJ's decision.  ECF Dkt. #16 at 20.  Next, Defendant contends that even if the evidence were not cumulative, Dr. Scheatzle's FCE pertains to Plaintiff's condition months after the ALJ issued his decision, rather than Plaintiff's degree of impairment from the July 2011 alleged onset date until the March 19, 2015, decision by the ALJ.  *Id.* at 20-21.  Additionally, Defendant claims that the ALJ limited Plaintiff to sedentary work, use of an assistive device for periods of standing and/or walking, no operation of foot controls with her left foot, and no climbing of ladders, ropes, or scaffolds.  *Id.* at 21.  Based on these limitations, Defendant asserts that Dr. Scheatzle's opinion regarding Plaintiff's functional limitations would not have altered the ALJ's RFC assessment, or his ultimate decision that Plaintiff was not disabled.  *Id.*  Insofar as Dr. Schealtze's FCE indicated that Plaintiff was disabled, Defendant states that this determination is reserved to Defendant.  *Id.* (internal citations omitted).

Defendant's arguments are well taken.  Under sentence six of 42 U.S.C. § 405(g), remand for consideration of additional evidence is warranted only if the evidence is "new and material" and "good cause" is shown for the failure to present the evidence to the ALJ.  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (citing *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)).  First, Dr. Scheatzle's FCE was prepared five months after the ALJ issued his decision.  The burden to establish disability lies on Plaintiff.  *Moon,* 923 F.2d at 1181.  Plaintiff has failed to show good cause for failure to submit Dr. Scheatzle's FCE, a FCE from a different source, or another opinion containing a similar assessment to the ALJ prior to the decision being issued.  As stated by Defendant, Plaintiff received medical treatment during the time period in which she alleges that she could not afford to be evaluated.  *See* Tr. at 522, 901-15.  Plaintiff has failed to explain why she did not ask either physician that had treated her to issue an opinion.  Moreover, as Dr. Scheatzle's FCE was issued five months after the ALJ's decision, the FCE does little to expand on Plaintiff's condition from the alleged onset date through the date of the ALJ's decision.

In the instant case, the ALJ issued a thorough decision explaining how he determined that Plaintiff was not disabled.  Plaintiff now asks the Court to remand this case on the basis of a FCE prepared five months after the ALJ issued his decision.  Regarding good reason for the Plaintiff's failure to provide the FCE to the ALJ prior the decision being issued, Plaintiff claims that she could

-25-

not afford to undergo the FCE.  While it is unfortunate that Plaintiff was unable to afford this treatment, it does not alleviate her burden to prove disability.  Since Plaintiff has failed to provide good reasons as to why she did not provide the FCE to the ALJ prior to his decision being issued, the Court need not address whether the decision constitutes new and material evidence.  *See Ferguson*, 628 F.3d at 276.  For these reasons, the undersigned finds that remand pursuant to sentence six of 42 U.S.C. § 405(g) is not warranted.

### D.      Hypothetical Question

Plaintiff also claims that the hypothetical question posed by the ALJ to the VE did not contain all of her limitations since Dr. Scheatzle's FCE was not considered by the ALJ.  First, Dr. Scheatzle's FCE was not in existence at the time the ALJ questioned the VE.  Second, for the reasons stated above, Dr. Scheatzle's FCE is not new and material evidence for which Plaintiff has shown good cause for failure to provide it to the ALJ prior to his decision.  As such, the hypothetical question posed to the VE by the ALJ was proper, and Plaintiff's argument is without merit.

## VII.    CONCLUSION AND RECOMMENDATION

For the above stated reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

Date: March 17, 2017                           ___*/s/George J. Limbert*_____
                                                              GEORGE J. LIMBERT
                                                              UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).